```
 1                IN THE COURT OF COMMON PLEAS

 2                   CUYAHOGA COUNTY, OHIO

 3                         - - -

 4   LAMAR L. WRIGHT,            )

 5          Plaintiff,           )

 6     vs.                       )   CASE NO. 1:17-CV-02503

 7   CITY OF EUCLID,             )   JUDGE DONALD C. NUGENT

 8          Defendants.          )

 9                               )

10                         - - -
```

11          Deposition of LAMAR L. WRIGHT, the Plaintiff

12   herein, called by the Defendants for Cross-Examination

13   pursuant to the Ohio Rules of Civil Procedure, taken

14   before me, the undersigned, Shanterra M. Harris a

15   Stenographic Reporter and Notary Public in and for the

16   State of Ohio, at the law offices of Mazanec, Raskin &

17   Ryder Company, LPA, 100 Franklin's Row, 34305 Solon

18   Road, Solon, Ohio, on Thursday, the 26th day of July,

19   2018, commencing at 9:34 a.m.

20                         - - -

Exhibit G

 1      Q.  In those prior four representations, did any of

 2   the charges involve arrests from the City of Euclid?

 3      A.  Yes.

 4      Q.  How many, if you know?

 5      A.  I can't recall.

 6      Q.  You can set those aside.  Thank you.  We are

 7   going to talk a little bit about November 4th, 2016,

 8   okay?

 9      A.  Okay.

10      Q.  Where were you staying as of November 4th, 2016?

11      A.  523 East 143rd.

12      Q.  My understanding is that prior to November 4th,

13   2016, you had rented a vehicle; is that correct?

14      A.  Yes.

15      Q.  What vehicle was that?

16      A.  It was a 2016 Ford Edge.

17      Q.  What color was it?

18      A.  Silver.

19      Q.  What rental company did you rent it from?

20      A.  Avis.

21      Q.  Do you remember the date you rented that vehicle?

22      A.  No.  I can't recall the actual date.

23          MR. PINZONE:     We are going to mark this

24   as Defendant's Exhibit A.

25          (Thereupon, Defendant's Exhibit A of the

```
 1              deposition was marked for purposes of

 2              identification.)

 3      Q.  Mr. Wright, I'm going to hand you what has been

 4  marked as Defendant's Exhibit A.  It is a document that

 5  your counsel has produced in this matter.  Take a look

 6  at it.  I just have a couple of questions for you.

 7          Have you ever seen what has been marked as

 8  Defendant's Exhibit A before?

 9      A.  Yes.

10      Q.  And what do you recognize this as, if you know?

11      A.  Payments that I made to Avis.

12      Q.  Based on Defendant's Exhibit A, there is at the

13  bottom on the first page Bates numbered Wright 35.  It

14  says checkout location BW2, October date -- October

15  22nd, 2016.

16          Do you recall if October 22nd, 2016, would have

17  been the date that you rented that vehicle?

18      A.  Yes.

19      Q.  What did you do to rent that vehicle?  Did you go

20  to a specific Avis location?

21      A.  Yes.

22      Q.  Do you remember what location that was?

23      A.  Beachwood, Chagrin.

24      Q.  Had you rented cars from Avis in the past?

25      A.  No.
```

1    errands?  What roads, highways, streets, did you take?

2        A.   What is that, 90.

3        Q.   And so when you get to Euclid after running your

4    errands, you go to your aunt's house, correct?

5        A.   Yes.

6        Q.   And that is the 21060 Miller Avenue address; is

7    that correct?

8        A.   Yes.

9        Q.   Around what time did you get to your aunt's

10   house?

11       A.   5:30, 6:00, somewhere around there.

12       Q.   When you get to your aunt's house, is she home?

13       A.   Yes.

14       Q.   Is anybody else there at that point in time?

15       A.   No.

16       Q.   Do you spend any time at her house?

17       A.   Yes.

18       Q.   How long did you spend there?

19       A.   Probably like 20 minutes, a half hour.

20       Q.   Were you talking with her?

21       A.   Yes.

22       Q.   Do you recall what you were talking about?

23       A.   No.

24       Q.   And at any time during -- strike that.  Was there

25   anyone else that came to your aunt's house during this

1  20 or 30 minutes that you were there?

2      A.  No.

3      Q.  After about the 20 or 30 minutes that you were at

4  your aunt's house, what did you do next?

5      A.  I went to the gas station and got a water.

6      Q.  Where is the gas station located?

7      A.  On Miller up the street from my aunt's house.

8      Q.  Is it at an intersection?

9      A.  Yes.

10     Q.  What is the intersection?

11     A.  222nd.

12     Q.  Was anyone with you at this point in time?

13     A.  No.

14     Q.  And what did you do at the gas station?

15     A.  Bought a water.

16     Q.  Anything else?

17     A.  No.

18     Q.  How did you pay for the water?

19     A.  Cash.

20     Q.  All right.  What did you do after going into the

21  gas station?

22     A.  After the gas station, I rode down the Marginal.

23     Q.  And where were you going at that point?

24     A.  At that point I was just blowing off some time

25  because we were supposed to do something, me and my

Deposition of Lamar Wright                    Lamar Wright, vs. City of Euclid, et al,

1   Q.  Let me help you.  Let's mark this as Defendant's
2   Exhibit B.
3                (Thereupon, Defendant's Exhibit B to the
4                deposition was marked for purposes of
5                identification.)
6   Q.  You have been handed Defendant's Exhibit B, which
7   I think might help us along as far as the routes you may
8   have taken, at least to get a particular idea or bearing
9   of where you were or going, okay?
10       So on Defendant's Exhibit B you see 21060 Miller
11  Avenue?
12  A.  Yes.
13  Q.  And that is where your aunt lived, correct?
14  A.  Yes.
15  Q.  And so my understanding is you left your aunt's
16  house around 6 p.m., and went to the intersection of
17  Miller and East 222nd; is that correct?
18             MS. GREENE:          Objection.  I think that
19  mischaracterizes his testimony of the timeframe.
20  Q.  Regardless of the timeframe, you left your aunt's
21  house in the evening, and you went down Miller Avenue?
22  A.  Yes.
23  Q.  Why don't you draw -- here you go, a line from
24  Miller Avenue to the gas station that you first stopped
25  at.  Okay.  Why don't you write, "gas."

1          MS. GREENE:          He didn't ask you

2   anything yet.  I'm sure he will, but not yet.

3        Q.  That was the next step.  Okay.  So after stopping

4   at the gas station you headed -- you took a left onto

5   East 222nd, is that where you started drawing that, or

6   you started heading?  I believe that would be south.

7   Why don't you just draw where you went after you stopped

8   at the gas station?

9          Okay.  So you headed down East 222nd to North

10  Lakeland Boulevard.  Now, is that called -- is that the

11  Marginal?

12       A.  I call it the Marginal, but it is North Lakeland.

13       Q.  Fair enough.  And you headed down North Lakeland

14  Boulevard to East 207th?

15       A.  Yes.

16       Q.  And then you take a right onto East 207th,

17  correct?

18       A.  Yes.

19       Q.  Do you stop anywhere on East 207th?

20       A.  Yes.

21       Q.  Where did you stop?

22       A.  At Chris's house.

23       Q.  Do you know his last name?

24       A.  No.

25       Q.  Do you know his address?

```
 1      A.  No.  I don't know the address there.

 2      Q.  And what were you doing when you stopped at

 3   Chris's house?

 4      A.  Making small talk.

 5      Q.  How long had you known Chris?

 6      A.  Some years.  Few years.  Some years.

 7      Q.  And, again, you don't recall his exact address,

 8   correct?

 9      A.  No.

10      Q.  How long did you stop and talk to Chris?

11      A.  A minute.

12      Q.  I'm trying to see if I have a better map.  Did

13   you get out of your car to talk to Chris?

14      A.  No.

15      Q.  And you said you were there only about a minute?

16      A.  Yes.

17      Q.  Did you pull up Chris's driveway?

18      A.  No.

19      Q.  Did Chris come out to talk to you?

20      A.  He was already on the porch.

21      Q.  And you can't today, as you sit here today, you

22   don't recall Chris's last name; is that correct?

23      A.  No.

24      Q.  And you can't recall his exact address on 207; is

25   that correct?
```

1    A.  Correct.

2    Q.  **And you can't recall what you talked about; is**

3  **that right?**

4           MS. GREENE:          Objection.  That

5  mischaracterizes his prior testimony.

6    Q.  **Can you recall what you talked with Chris about?**

7  **I think you said small talk.**

8    A.  Small talk, like, basically my health.

9    Q.  **As far as?**

10   A.  My surgery.

11   Q.  **Surgery.  After this brief conversation with**

12 **Chris, did you speak to anyone else at this particular**

13 **residence?**

14   A.  No.

15   Q.  **Do you recall getting out of the vehicle you were**

16 **driving to talk to Chris?**

17   A.  No.

18   Q.  **I might have asked you this.  Was there anybody**

19 **else with Chris when you had this conversation?**

20   A.  No.

21   Q.  **All right.  What do you do after talking to**

22 **Chris?**

23   A.  I pulled out the driveway.

24   Q.  **Did you back out?**

25   A.  Yes.

1  A.  I got a text from Kiyaka telling me what time and

2  when would I be there to come get her.

3  Q.  **And that is while you are driving down East 212th**

4  **Street?**

5  A.  Correct.  I knew Ron whose house I pulled in.  So

6  I pulled in his driveway because I know him and just

7  wanted to use the phone real quick, because I didn't

8  want to be texting and driving so I pulled in his yard.

9       And as I was looking at my phone and texting,

10  that is when I looked to my right.

11  Q.  **So do you recall the address, Ron's address?**

12  A.  I don't know it offhand.  I just know the house.

13  Q.  **Describe the house for me.**

14  A.  Three steps, a little porch, tan house.

15  Q.  **How did you know Ron?**

16  A.  Living in the neighborhood.  He walks his dog and

17  I know his daughter -- well, know of his daughter.

18  Q.  **Had you ever spoken to his daughter before?**

19  A.  Yes.

20  Q.  **Do you recall her name?**

21  A.  I forgot her name.

22  Q.  **Do you recall what you talked to her about?**

23  A.  Just, you know, making small talk.  Just seeing

24  how she was doing or something like that, but I didn't

25  talk to her that day.

1    Q.   I see.  Can you tell me any recollection of any

2    conversations you had with Ron prior to November 4th,

3    2016?

4    A.   No.  I just be saying hi and bye basically.  If I

5    walk the dog and -- he has a dog so I just, you know,

6    say hi and bye basically speak to him.

7    Q.   You got a text from your girlfriend?

8    A.   Yes.

9    Q.   And you are still driving at that point when you

10   got the text?

11   A.   Yes.

12   Q.   How did you know you got the text?

13   A.   Because my phone makes a sound.

14   Q.   And before reading the text, did you pull into

15   Ron's driveway?

16   A.   No.

17   Q.   What type of phone did you have that received

18   that text?

19   A.   It was like a little black phone.

20   Q.   Do you recall what brand it was?

21   A.   I can't recall.

22   Q.   Do you remember your provider?

23   A.   Was it Page Plus.  I think it was Page Plus.

24          MS. GREENE:       To the best of your

25   memory.

1  Q.  **What does the text say?**

2  A.  I can't really say what it said.

3  Q.  **You can't recall?**

4  A.  Recall, yes.

5  Q.  **While you were stopped in Ron's driveway, this is**

6  **when the Euclid police officers approached your vehicle;**

7  **is that correct?**

8  A.  Yes.

9  Q.  **All right.  Walk me through what you remember, or**

10  **what you observed as far as the officers coming up to**

11  **your car, and before they opened the door of the car?**

12  A.  So when I was texting, I happened to look to my

13  right, and that is when I seen a guy with dark clothing.

14  So I dropped the phone and threw the car in reverse.

15  And when I throw the car in reverse, I heard yelling and

16  stuff like that.

17         So I looked to this side because there was

18  another guy yelling.  And they were telling me get out

19  the car.  Put the car -- so I slammed it in park,

20  because I realized it was officers, and that is when I

21  put my hands up.

22  Q.  **Let me stop you there.  So you said you looked to**

23  **your right?**

24  A.  Yes.

25  Q.  **And that is towards outside the passenger window;**

1    is that correct?

2       A.  Yes.

3       Q.  You see a man in dark clothing at that point,

4    correct?

5       A.  Yes.

6       Q.  Was it a Caucasian or African-American man?

7       A.  I can't recall.

8       Q.  Do you remember what he was yelling, at that

9    point, when you looked to the right?

10      A.  "Shut the car off."  Just -- it was a lot of

11   yelling.  I just heard, "Shut the car off," and

12   something else.

13      Q.  Did you hear, "Shut the car off," from the man to

14   the right by the passenger's side window?

15      A.  I can't recall.

16      Q.  After looking to the right, you said you then

17   looked to the -- well, I'm sorry, that is when you put

18   the car in reverse?

19      A.  Reverse.

20      Q.  Okay.  You put the car in reverse.  Let me ask

21   you this:  Why did you put the car in reverse?

22      A.  Because I thought I was being robbed or

23   something.

24      Q.  So you put the car in reverse.  Did the car move

25   at all after putting it in reverse?

 1  The driver's side he had a flashlight so it lightweight

 2  blinded me.

 3      Q.  So you couldn't tell?

 4      A.  Right.

 5      Q.  The driver's side door is opened after you

 6  manually unlock it, correct?

 7      A.  Correct.

 8      Q.  Is the car still running at that point?

 9      A.  Yes.

10      Q.  Tell me what you remember happening after you

11  unlocked the door.

12      A.  He told me to turn the vehicle off.

13      Q.  And let me stop you.  He opens the door after you

14  manually unlock it, correct?

15      A.  Yes.

16      Q.  Go ahead.

17      A.  So I turned the car off.  He opened the door.  He

18  said, "Let me see your arm.  Let me see your arm."

19          I told him, "You are hurting my arm."  And he was

20  twisting it this way.

21          So from me having surgery my stomach was still

22  lightweight open from the staples.  I had to lift up off

23  the armrest with this arm, so I wasn't moving too fast

24  for him, and that is when they started getting a little

25  rough, and tasered me and maced me.  Because I wasn't

```
 1    moving fast enough for them.

 2          And I was trying to tell them that I had a

 3    colostomy bag on, but they were yelling so loud that I

 4    was just trying to comply so I wouldn't get hurt.

 5      Q.  I'm going to backup and walk you through it.

 6      A.  Okay.

 7      Q.  All right.  So the officer opens the door?

 8      A.  Yes.

 9      Q.  And you did testify before, that even after the

10    door was open you heard them yell, "Shut the car off,"

11    correct?

12      A.  Yes.

13      Q.  When the officer opens the door, where is your

14    hands at that point?

15      A.  In the air.  I can't recall if it was a push

16    button or a key, but I know I turned the car off and I

17    went like this.

18              MS. GREENE:      For the record, can you

19    describe what you are demonstrating?

20              THE WITNESS:     I went like this.  He

21    opened the door, turned the car off, and that is when I

22    went like this.

23              MS. GREENE:      When you say you, "went

24    like this," what do you mean?

25              THE WITNESS:     Like I had my hands up.
```

1    wrap around your midsection because it is cold, and you

2    have got sutures there and you are trying to protect the

3    sutures; is that right?

4        A.  Yes.

5        Q.  What type of wrap is that?

6        A.  One of the wraps you can go like this and they

7    can put the clip, little silver piece on.  One of those

8    type.

9        Q.  Yes.  A medical wrap?

10       A.  Yes.

11       Q.  And the bag is outside of the wrap, correct?

12       A.  Correct.

13       Q.  On the day of the incident, were you wearing a

14   T-shirt or some sort of shirt over both the wrap and the

15   bag?

16       A.  Yes.

17       Q.  And then were you wearing any type of jacket on

18   the day of the incident?

19       A.  Yes.

20       Q.  So neither the wrap nor the bag would have been

21   visible because it was underneath your shirt and jacket;

22   is that correct?

23       A.  Correct.

24       Q.  Let's go back.  You recall them grabbing your

25   arm, the officer on the passenger's -- I'm sorry, on the

1   driver's side grabbing your arm.  Do you recall him

2   giving any instructions when he is grabbing your left

3   arm?

4       A.  Yes.

5       Q.  What were the instructions?

6       A.  "Let me see your arm."

7       Q.  Any other verbal commands that you recall the

8   officers giving you at that point in time?

9       A.  I can't recall.

10      Q.  Was the car already turned off at that point?

11      A.  Yes.

12      Q.  And you said that you were pushing up on the

13  console with your right arm; is that correct?

14      A.  Yes.

15      Q.  And the reason you are doing that is because the

16  colostomy bag isn't letting you have the freedom of

17  movement you normally would; is that correct?

18      A.  No.

19      Q.  Why are you using --

20      A.  The staples.

21      Q.  I see.  So the sutures, the staples, don't give

22  you the freedom of movement, right?

23      A.  Right.

24      Q.  So you are pushing up on the console with your

25  right arm, correct?

1  A.  Correct.

2  **Q.  Tell me what you remember happening after that.**

3  A.  He said, "Let me see your arm."  The other

4 officer came around to assist him, and that is when I

5 felt the mace.  They maced me, and that is when he

6 tasered me.  One of them tasered me.

7   And when they stopped tasering me, that is when I

8 was able to get up out of the car.  Because he was

9 pulling on my arm too, so I just went to the ground.

10  **Q.  Do you recall the officer on the driver's side**

11 **ever grabbing your back shoulder, your right shoulder?**

12  A.  I can't recall.

13  **Q.  What do you remember first, being tasered or the**

14 **mace?**

15  A.  It seemed like it happened both at the same time

16 but I don't know.  It just seemed like it happened at

17 the same time.

18  **Q.  After the use of the taser and the mace, you came**

19 **out of the car; is that correct?**

20  A.  Correct.

21  **Q.  When the officer on the driver's side opens the**

22 **door, do you recall seeing whether he had his weapon**

23 **drawn at that point?**

24  A.  What did you say, on the driver's side of the

25 door?

```
 1   the mace?

 2        A.  Better than what it felt like.

 3        Q.  Do you recall at what, if any, point you told the

 4   officers you had a colostomy bag?

 5        A.  I told them that before they tasered me.

 6        Q.  So your recollection is that you told them that

 7   you had a colotomy bag before they tasered you?

 8        A.  Yes.

 9        Q.  At any point after, do you recall telling them

10   that you had a colostomy bag?

11        A.  After what?

12        Q.  After you came out of the car.

13        A.  Yes.  When I was on the ground.

14        Q.  Let's do this.  I am no technological mystro, but

15   we are going to watch a portion of the video from the

16   incident.

17        A.  Okay.

18        Q.  Let me ask you this:  Have you ever seen the body

19   cam video from that day?

20        A.  From that day?

21        Q.  From that incident?

22        A.  Yes.

23             MR. PINZONE:       Can we mark this as

24   Defendant's Exhibit C.  And I will give you a copy.  Do

25   you need a break at all?  Are you okay?
```

```
 1              (Thereupon, a discussion was held off the

 2         record.)

 3    Q.  Let's go back on the record.  We are going to

 4   look at Defendant's Exhibit C video again.  I'm going to

 5   back it up to 2:40.  So it is 2:40 on video, 2 minutes

 6   and 40 seconds.  I'm going to stop it at 2:52.

 7         Did you hear during that span of time you state

 8   that, I was reaching for my phone?

 9    A.  I couldn't really hear it.

10    Q.  We will try it one more time.  And I understand

11   it is not the clearest audio, so we will play it again.

12   Starting at about 2:42, and let me turn it up.

13    A.  I couldn't really hear it because I'm coughing,

14   and I couldn't really hear it.

15    Q.  Do you recall the officers taking the taser barbs

16   off of you?

17    A.  Yes.

18    Q.  Do you remember if it was before or after they

19   gave you water?

20    A.  Before.

21    Q.  Do you remember if the taser barbs had actually

22   penetrated through your skin?

23    A.  One of them did.

24    Q.  And did the other one make it through your

25   clothes?
```

 1    A.  No.  It just hit the jacket.

 2    Q.  **Where do you recall the taser barbs being located**

 3  **on your body?**

 4    A.  Right here.

 5    Q.  **So you are pointing to your left?**

 6    A.  Left.

 7    Q.  **Upper arm?**

 8    A.  Yes.

 9    Q.  **And both of them were there?**

10    A.  Both of the taser things, yes.

11    Q.  **So both of the taser barbs were in your upper**

12  **left arm.  Only one penetrated your skin, correct?**

13    A.  Correct.

14    Q.  **And I think you already stated it was about five**

15  **minutes between the time you got out of the vehicle, and**

16  **when the ambulance came, correct?**

17    A.  Correct.

18    Q.  **When the ambulance gets there, what happens next?**

19    A.  They put me in the ambulance I was telling them

20  it was still burning, could they give me something to

21  blow my nose.  Because it was so far up in my nose I

22  felt like I had to throw up.

23        So I was just telling them, "Could you wipe my

24  face?"

25        And they said, "It isn't good to wipe your face,

```
 1    it is good to just pat it."
 2        Q.  Was an officer telling you that or was a
 3    paramedic telling you that?
 4        A.  An officer and a paramedic told me that.
 5        Q.  Did the paramedics ever give you water for your
 6    face?
 7        A.  No.
 8        Q.  Did the paramedics give you anything to blow your
 9    nose with?
10        A.  Yes.
11        Q.  Did that alleviate some of the issues you were
12    having?
13        A.  Yes.
14        Q.  Do you remember how long it took for you to get
15    from the scene of the incident to -- let me back up.
16    Did you go with an ambulance to a hospital?
17        A.  Yes.
18        Q.  Do you remember how long it took to get from the
19    scene of the accident to the hospital?
20        A.  Like five minutes.
21        Q.  Do you remember was there any officer with you
22    while you were being transported to the hospital?
23        A.  Yes.
24        Q.  Was it a white officer or black officer?
25        A.  A white officer.
```

1    Q.  A scan?

2    A.  A CAT scan.

3    Q.  Had you talked with a nurse or doctor prior to

4  getting red dye about getting a CT scan or any type of

5  scan or x-ray?

6    A.  No.

7    Q.  Had you talked to the officer that was there

8  about getting a scan prior to the red dye being given to

9  you?

10    A.  No.

11    Q.  How did you find out that the red dye was for a

12  scan or an x-ray?

13    A.  Because I was just in the hospital, and I just

14  went through the whole procedure of the CAT scan and all

15  of that, so I didn't want that.

16    Q.  So did you verbally then refuse any type of scan

17  or x-ray at that point?  Did you tell the doctor, "I

18  don't want a scan or an x-ray"?

19    A.  Yes.

20    Q.  And I take it you were never given a scan or an

21  x-ray then?

22    A.  No.  Because I refused it.  I mean, they had me

23  in the room, they wheeled me to the x-ray room so I was

24  about to get out, and I just was like, "I don't want

25  this radiation on my skin.  I had just been through all

1    it was like four of them.

2            And I said, "Are you serious?"

3            And they were like, "Yeah."  And that is when

4    they discharged me there, and they took me to Euclid

5    jail.

6        Q.  I want to back up real quick.  And I should have

7    asked you, the reason that you didn't want the scan or

8    x-ray is because you didn't want any more radiation,

9    because you just went through with that, correct?

10       A.  Correct.

11       Q.  Do you recall who transported you to Euclid jail?

12       A.  The same officers.

13       Q.  The officers involved in the incident?

14       A.  Involved in it, yes.

15       Q.  Were they together?

16       A.  I can't recall.

17       Q.  Were they in a cruiser?

18       A.  I can't recall.  I know it was a cruiser though,

19   but I can't recall was it a truck or a car.

20       Q.  How long did it take you to get from the hospital

21   to the Euclid jail?

22       A.  Five minutes.

23       Q.  Tell me what happens once you get to the Euclid

24   jail.

25       A.  Once I go there they just had me doing like

```
 1  fingerprints and all that type of stuff and was telling
 2  me what my bond was.  But they had left, because it was
 3  11:00, the police had left already.  So they got off, so
 4  I was talking to this lady that was taking my
 5  information and stuff like that.
 6      Q.  So the officers that brought you there left, and
 7  you went through the intake process?
 8      A.  Yes.
 9      Q.  And after the officers left the jail, did you
10  have any other contact with them at any other point in
11  time?
12      A.  No.
13      Q.  So that was the last time you saw those two
14  officers?
15      A.  Yes.
16      Q.  Tell me what you were told about posting bond.
17      A.  Well, she was like, "Yeah, do you want to make a
18  phone call?"
19          I said "Yes."  I called my cousin, told him where
20  I was at.  He came to pay the bond.
21          When he paid the bond, and it was about time for
22  me to go, she said, "Hold on.  We have to take you
23  downtown."
24          I said "For what?"
25          She said, "The two officers said they want you to
```

Deposition of Lamar Wright                          Lamar Wright, vs. City of Euclid, et al,

```
 1    we are taking you to Cleveland jail?
 2         A.  He already posted the bond.
 3         Q.  He already posted the bond.  Do you know what
 4    time he would have posted that bond?
 5         A.  11:30, 12:00.
 6         Q.  Do you know how he posted that bond?  Where did
 7    he go?  What does he do?
 8         A.  He works.
 9         Q.  But, I mean, to actually post the bond.
10         A.  He had to come out to Euclid and post the bond.
11    When he posted the bond, the lady was still doing my
12    information.  The lady was like, "Yeah, your cousin just
13    posted your bond."
14             I'm like "Thank you."
15             She was like, "But you have to go downtown.  The
16    officers want you to go downtown."
17             And I'm like, "For what?"
18             "They said they want you to do a scan to see if
19    you have anything in your body."
20         Q.  Did you talk to Frank at all before you left?
21         A.  No.
22         Q.  Other than your phone call to him, correct?
23         A.  No.  I just told him -- no.
24         Q.  So after you go through that intake process, what
25    happens next?
```

1   Q.  **Tell me what happens once you get to the jail in**

2   **downtown Cleveland.**

3   A.  So we got into the garage.  Come in.  They like,

4   "Is that Mr. Wright?"

5         He said, "Yeah."

6         They said, "Well, your name has been all through

7   the scanners."  So I'm like damn.  So I'm sitting there

8   waiting on the bench for her to call me, because I had

9   to go through another -- them taking my name down, going

10  through that process again that I just did at Euclid.

11        And she was like, "Yeah, go through the machine.

12  Take your shoes off and stuff, and we want you to go

13  through the machine."

14        So I stood there.  Held my hands out with my

15  shoes, and then she told me to put my hands to my side

16  and let the thing take you back and forth.  So after

17  that, she seen that it wasn't nothing in my system, she

18  was like, "You can have a seat on the bench."

19        I had a seat for a second and then she was like,

20  "Come here."  And I forget what she was telling me or

21  something, but I know she was saying like, "They fucked

22  up."

23  Q.  **And when you say she --**

24  A.  The police officer.  The Cleveland police officer

25  that was doing my intake.

```
 1            So I'm like, "Yeah, I'm fine."  Took me upstairs
 2    to the nurse, and when they took me upstairs, I came
 3    back down, and it was time for me to go.
 4        Q.  When you say, it was time for you to go --
 5        A.  They were releasing me.  Giving me all my
 6    paperwork and stuff like that.  Was telling me when I
 7    would have a court date.
 8        Q.  Did you at that point in time receive the
 9    citations for the alleged traffic violations and the
10    complaints?  Is that when you received, like, the
11    documentation of that?
12        A.  Yes.
13        Q.  Do you recall around what time you would have
14    been released?
15        A.  Like 3:30 in the morning.
16        Q.  Who picked you up?
17        A.  My cousin, Frank.
18        Q.  When you were at the downtown Cleveland jail, did
19    you request any type of medical treatment?
20        A.  I told them that it was mace on my body for a
21    long period of time, and they said, "Your bond has been
22    paid.  We just needed to do this and you will be
23    released.  So you can take care of that on your own."
24        Q.  At that point in time, what type of effect was
25    the mace having?
```

```
 1              C  E  R  T  I  F  I  C  A  T  E

 2

        STATE OF OHIO,      )
 3                          )  SS:
        SUMMIT COUNTY,      )
 4

            I, Shanterra M. Harris, a Stenographic Reporter and
 5      Notary Public within and for the State of Ohio, duly
        commissioned and qualified, do hereby certify that the
 6      within-named witness, LAMAR L. WRIGHT  was by me first
        duly sworn to testify the truth, the whole truth and
 7      nothing but the truth in the cause aforesaid; that the
        testimony then given by him was by me reduced to
 8      Stenotypy in the presence of said witness, afterwards
        prepared and produced by means of Computer-Aided
 9      Transcription and that the foregoing is a true and
        correct transcription of the testimony so given by him
10      as aforesaid.
            I do further certify that this deposition was taken
11      at the time and place in the foregoing caption
        specified, and was completed without adjournment.
12          I do further certify that I am not a relative,
        employee of or attorney for any party or counsel, or
13      otherwise financially interested in this action.
            I do further certify that I am not, nor is the court
14      reporting firm with which I am affiliated, under a
        contract as defined in Civil Rule 28(D).
15          IN WITNESS WHEREOF, I have hereunto set my hand and
        affixed my seal of office at Cleveland, Ohio on this
16      17th day of August, 2018.

17

18

19                       Shanterra Harris

20              _____
                Shanterra M. Harris Stenographic
21              Reporter and Notary Public in and
                for the State of Ohio.
22
                My commission expires March 2, 2022.
23                          -  -  -

24

25
```



DEFENDANT'S EXHIBIT
B. WRight
SMH - 7.26.18
PENGAD 800-631-6989

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LAMAR WRIGHT, | ) | CASE NO.:  1:17-CV-02503 |
| | ) | |
| Plaintiff, | ) | JUDGE:  DONALD C. NUGENT |
| | ) | |
| vs. | ) | **NOTICE OF MANUAL FILING OF** |
| | ) | **DEFENDANTS' EXHIBIT C TO** |
| CITY OF EUCLID, et al., | ) | **PLAINTIFF'S DEPOSITION** |
| | ) | |
| Defendants | ) | |

Now come Defendants, City of Euclid, Euclid Police Officer Kyle Flagg, #61, and Euclid

Police Officer Vashon Williams, #9, by and through counsel, Mazanec, Raskin & Ryder Co.,

L.P.A., and hereby give notice of the manual filing with the Clerk of the United States District

Court Northern District of Ohio, the video supplement of Plaintiff's Deposition, Exhibit G to

Defendants' Motion for Summary Judgment, in support of filing ECF 19, which is Defendants'

Exhibit C.

The video and audio is being filed manually at the request of the Court as the electronic

file size of the document exceeds 35 megabytes.

MAZANEC, RASKIN & RYDER CO., L.P.A.

*s/John D. Pinzone*
JAMES A. CLIMER (0001532)
JOHN D. PINZONE (0075279)
100 Franklin's Row
34305 Solon Road
Cleveland, OH  44139
(440) 248-7906
(440) 248-8861 – Fax
Email:   jclimer@mrrlaw.com
            jpinzone@mrrlaw.com

*Counsel for Defendant City of Euclid, Euclid Police*
*Officer Kyle Flagg, #61, and Euclid Police Officer*
*Vashon Williams, #9*

Exhibit C

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2019 a copy of the foregoing Notice of Manual Filing of Defendants' Exhibit C to Plaintiff's Deposition was filed electronically.  Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*s/John D. Pinzone*
JOHN D. PINZONE (0075279)

*Counsel for Defendant City of Euclid, Euclid Police Officer Kyle Flagg, #61, and Euclid Police Officer Vashon Williams, #9*

EUCLID-170323/Not MF Flagg body cam

2