**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **LAMAR WRIGHT**, | **CASE NO. 1:17-CV-02503** |
| Plaintiff, | **JUDGE DONALD C. NUGENT** |
| -vs- | |
| **CITY OF EUCLID, et al.** | |
| Defendants. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

JACQUELINE GREENE (0092733)
SARAH GELSOMINO (0084340)
TERRY H. GILBERT (0021948)
FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
(216) 241-1430
(216) 621-0427 – Fax
jgreene@f-glaw.com
sgelsomino@f-glaw.com
tgilbert@f-glaw.com

*Counsel for Plaintiff Lamar Wright*

Dated: March 5, 2019

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

    I.   Events of November 4, 2016 ...................................................................................... 1

    II.   City of Euclid Policies, Practices, and Customs ................................................... 13

LAW AND ARGUMENT................................................................................................. 16

    I.   Summary Judgment Standard................................................................................. 16

    II.   Plaintiff's Case Against Flagg and Williams Must Proceed to Trial. ................... 16

        A.   Flagg and Williams Violated Lamar Wright's Constitutional Rights. ...................... 16

            1.   *Wright's Fourth Amendment Unreasonable Search and Seizure Claims against Flagg and Williams Must Survive Summary Judgment.* .......................... 16

            2.   *Wright's Federal Malicious Prosecution Claim against Flagg and Williams Must Survive Summary Judgment.* ....................................................... 22

        B.   Wright's Federal Claims Were Clearly Established on November 4, 2016, and Flagg and Williams Are Not Entitled to Qualified Immunity. ................................... 24

        C.   State Law Claims against Flagg and Williams Survive Summary Judgment............ 26

            1.   *Wright's State Malicious Prosecution Claim Must Survive Summary Judgment.* ................................................................................................. 26

            2.   *Wright's Intentional Infliction of Emotional Distress Claim Must Survive Summary Judgment.* ........................................................................... 27

            3.   *Flagg and Williams Are Not Entitled to Ohio Rev. Code § 2744 Immunity.* ........ 28

    III.   The City of Euclid Was the Moving Force Behind Constitutional Violations Suffered by Lamar Wright. ................................................................................................. 28

CONCLUSION ................................................................................................................ 30

CERTIFICATE OF SERVICE ......................................................................................... 31

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGES**

*Albright v. Oliver*, 510 U.S. 266 (1994) ……………………..…….…………………….…24

*Anderson v. Creighton*, 483 U.S. 635 (1987) ……………………..…………………….....26

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) …………………………………….…   16

*Anderson v. Massillon*, 134 Ohio St.3d. 380, 983 N.E. 2nd 266 (2012) ………………….….28

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ……………………..……………………………..25

*Ash v. Ash*, 72 Ohio St.3d 520 (1995) ……………………..………………….……..27

*Barber v. City of Salem*, 953 F.2d 232 (6th Cir. 1992) …………………….…..……………….28

*Baynes v. Cleland*, 799 F.3d 600 (6th Cir. 2015) ……………………..…………………….25

*Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 396 (1997) …………..……….30

*Botto v. Fischesser*, 174 Ohio St. 322 (1963) ……………………..…………………….….28

*Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013) ……………………………………....28, 29

*Canton Provision Co. v. St. John*, 52 Ohio App. 507, 3 N.E.2d 978 (5th Dist. 1936) ………..…27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ………………………………………......…. 16

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006) ……………………………….........17, 30

*Cincinnati Enquirer, Inc. v. Abney*, 1st Dist. Hamilton No. C-870232,
     1988 Ohio App. LEXIS 1214 ……………………….…..………….………………………….27

*City of Canton v. Harris*, 489 U.S. 378 (1989) ……………………………………..28, 29, 30

*Connick v. Thompson*, 131 S. Ct. 1350 (2011) …………………………………....……..30

*Croom v. Balkwill*, 645 F.3d 1240 (11th Cir. 2011) …………………………………….18

*Daniel v. Cook Cnty.*, 833 F.3d 728 (7th Cir. 2016) …………………….…..…….…………28

*Doe v. Sullivan County, Tenn.*, 956 F.2d 545 (6th Cir. 1992) …………………….…..……...28

*Evans v. Ball*, 168 F.3d 856 (5th Cir. 1999) …………………..….…..………………...24

*Fisher v. Dodson*, 451 F. App'x 500 (6th Cir. 2011) ………………..……..…..………..24

*Flagg v. City of Detroit*, 715 F.3d 165 (6th Cir. 2013) …………………...…..……………29

*Fridley v. Horrighs*, 291 F.3d 867 (6th Cir. 2002) ……………….…..……..….………..21

*Gallo v. Philadelphia*, 161 F.3d 217 (3d Cir. 1998) …………………..……..….…………24

*Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000) ……………….…..……..….………21

*Garner v. Memphis Police Dep't*, 8 F.3d 358 (6th Cir. 1993) …………………...…..…......28

*Graham v. Connor*, 490 U.S. 386 (1989) ………………………...…..……………………17

*Gray v. City of Detroit*, 399 F.3d 612 (6th Cir. 2005) ………………...…..…………...…28

*Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007) …………………..….………………25

*Gumble v. Waterford Twp.,* 171 Fed. Appx. 502 (6th Cir. 2006) ………………...…..……22

*Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008) ………………...…..……………...20

*Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002) …………………...…..…..….………26

*Hope v. Pelzer*, 536 U.S. 730 (2002) …………………..….……………………...…..26

*Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010) ……………….…..…………………18

*Jocks v. Tavernier,* 316 F.3d 128 (2d Cir. 2003) …………………..…..….……….…..22

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) …………………..……………28

*King v. Harwood*, 852 F.3d 568 (6th Cir. 2017) ……………….…..…..………………23

*LeFever v. Ferguson*, 956 F.Supp.2d 819 (S.D. Ohio 2013) …………………..……….…24

*Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092 (1986)  ……………….…..……….23, 26

*Matulin v. Village of Lodi*, 862 F.2d 609 (6th Cir. 1988)…………………………………30

*McKinley v. Mansfield*, 404 F.3d 418 (6th Cir. 2005) …………………..……..…..……..23

*Meirthew v. Amore*, 417 F. App'x 494 (6th Cir. 2011) ……………….…..…..…….....18, 25

*Miller v. Calhoun Cnty.*, 408 F.3d 803 (6th Cir. 2005) ……………………….…..………….……29

*Miller v. Sanilac Cnty.,* 606 F.3d 240 (6th Cir. 2010) …………………….…...………...18, 23, 25

*Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978) ………………………………….28, 29, 30

*Morrison v. Bd of Trs. Of Green Twp.*, 583 F.3d 394 (6th Cir. 2009) ……………………..…..17

*Mott v. Mayer*, 524 F. App'x 179 (6th Cir. 2013) ……………………….…...………….…………23

*Mullenix v. Luna*, 136 S.Ct. 305 (2015) ………………….……..………………………....…..25

*Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997) ……………………….…...………….…………24

*Norton v. Stille*, 526 Fed. Appx. 509, 2013 FED App. 0477N (6th Cir. 2013) ……………19, 25

*Oklahoma v. Tuttle*, 471 U.S. 808 (1985) ……………………….…..…………………………… 30

*Paige v. Coyner*, 614 F.3d 273 (6th Cir. 2010) ……………………..…………………..…...29

*Pearson v. Callahan*, 555 U.S. 223 (2009) ……………………….………………………...25

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986) ……………………..……………...…..29

*Powers v. Hamilton Cnty. Public Defender*, 501 F.3d 592 (6th Cir. 2007) ……………………..30

*Pyle v. Pyle,* 11 Ohio App.3d 31 (1983) ……………………….…………………………27

*Rehberg v. Paulk*, 566 U.S. 356 (2012) ……………………….……..………………………23

*Reynolds v. Oakwood*, 38 Ohio App.3d 125 (Ohio Ct. App. 1987) ……………………………..28

*Rubin v. Ford Motor Co.,* 2006 U.S. Dist. LEXIS 51522, 2006 WL 2128934 (S.D. Ohio July 27, 2006) ……………………….………….……...27

*Rush v. City of Mansfield*, 771 F. Supp. 2d 827 (N.D. Ohio 2011) …………………………… 29

*Sanders v. Jones*, 845 F.3d 721 (6th Cir. 2017) ……………………….……..……………………23

*Saucier v. Katz*, 533 U.S. 194 (2001) ……………………….………………………...........25

*Scott v. Clay County, Tenn*., 205 F.3d 867 (6th Cir. 2000) ……………………….…..……....…… 28

*Shadrick v. Hopkins Cnty.*, 805 F.3d 724 (6th Cir. 2015) …………………………………..…... 30

*Sherrod v. Williams*, No. 3:14-cv-454, 2019 U.S. Dist. LEXIS 8915
(S.D. Ohio Jan. 15, 2019) …………………….…………………………….…………….…30

*Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681 (6th Cir. 2006) ……………….18, 19, 25

*Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998) …………………………..…………17

*Stewart v. City of Euclid, et al*., Case No. 1:17-CV-02122 (N.D. Ohio 2018)…………..14, 15, 30

*Sweat v. Butler*, 90 F. Supp. 3d 773 (W.D. Tenn. 2015) …………………….…..…………..…29

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010)………………………………………...22, 24, 26

*Thacker v. City of Columbus*, 328 F.3d 244, 255 2003 FED App. 0127P
(6th Cir. 2003)…………………………………………………………..20, 23, 26, 27

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ………………….…………… 29

*Thompson v. R&R Serv. Sys*., 10th Dist. Franklin No. 96APE10-1277,
96APE10-1278, 1997 Ohio App. LEXIS 2677 (1997) ………………….…..………..27

*Tourlakis v. Beverage Distribs., Inc.*, 2002 Ohio 7252,
2002 WL 31875970 (Ohio. Ct. App. 2002) ………………………..……….…………..26

*Turner v. Scott*, 119 F.3d 425 (6th Cir. 1997) ……………………….…..……………………20

*Webb v. United States*, 789 F.3d 647, 660, 665 (6th Cir. 2015) ………………….…..…...23, 26

*White v. Pauly*, 137 S.Ct. 548 (2017) ………………………………………………….…... 25

## RULES                                               PAGES

Fed. R. Civ. P. 56(c) …………………………….…..………………………………….…... 16

## STATUTES                                            PAGES

United States Constitution …………………………….…..………………………...……… *passim*

Ohio Rev. Code § 2744 …………………….…..…………………………………….……..28

Ohio Rev. Code §2901.13…………………….…..………….………………..…………… 13, 24

## INTRODUCTION

Defendants' Motion for Summary Judgment makes the critical mistake of ignoring key disputed facts underlying each of Plaintiff's claims. Lamar Wright was a victim of brutal, excessive force, and then falsely arrested and maliciously prosecuted for months. The City of Euclid was the moving force behind this these constitutional violations, and is therefore also liable. Plaintiff opposes Defendants' motion. A jury must hear and decide this case.

## STATEMENT OF FACTS

### I.    EVENTS OF NOVEMBER 4, 2016

In October 2016, Lamar Wright had surgery for diverticulitis, leading to staples in his stomach and a colostomy bag attached to his body. (Wright Dep., R.22, PageID#476.) After this surgery, Wright rented a car – a silver 2016 Ford Edge – to accommodate his limited mobility. (*Id.* PageID#447-449.)

During that time, Wright lived with his girlfriend, Kiyaka Reed, and her children. Approximately two weeks after surgery, on November 4, 2016, Wright left home to run errands and visit his aunt, who lived in the City of Euclid. On that date, Wright's driver's license was not subject to any restrictions or suspension. (Wright Dep., PageID#449-452, 476.) Wright arrived at his aunt's house around 5:30 or 6 PM. He left approximately 20 to 30 minutes later, and headed to a gas station up the street, where he purchased a bottle of water. (*Id.*, PageID#453-454.) Wright and his girlfriend planned to go to the movies later that evening, around 8:30 or 9 PM. He had time to kill beforehand, and took a drive around the neighborhood. (*Id.*, PageID#454-455.) Wright saw a friend, Chris, sitting on a front porch on East 207 Street. He pulled in at 854 East 207th Street, but did not pull all the way up the drive.[1] (*Id.*, PageID#458.) Wright stayed in his vehicle and spoke

---

[1] Flagg testified that he and Williams witnessed Wright's vehicle pulled up the driveway, all the way to the back of the residence, past their field of view. (Flagg Dep., R.23, PageID#567, 571; V.

to Chris, who sat on the porch. They engaged in small talk, including Wright's recent surgery, for approximately one minute. (*Id*., PageID#459.)

Meanwhile, unbeknownst to Wright, Euclid Police Officer Defendants Kyle Flagg and Vashon Williams were surveilling 854 East 207th Street in an unmarked Chevy Tahoe. They had no specific information about alleged complaints of drug activity at the address, and had no idea whether these complaints were stale.[2] (Flagg Dep., R.23, PageID#562, 574-576; V. Williams Dep., R.24, PageID#857-860.) Flagg and Williams were in plain clothes. Flagg was in a sweatshirt and dark pants, with an EPD baseball cap and police outer vest. Flagg claimed he had a badge on his left chest, on his cap, and on the outer thigh area of his right leg. Williams was in a dark long-sleeve shirt, dark jeans, boots, a baseball cap, and a plain bullet-proof vest, with a badge on a chain around his neck. (Flagg Dep., PageID#562-564; V. Williams Dep., PageID#860-861.)

Flagg and Williams saw Wright's vehicle stop at 854 East 207th Street but did not know Wright or anything about him at the time. (Flagg Dep., PageID#567.) Though they saw no criminal activity or narcotics transaction, Flagg and Williams called for units to assist. (*Id*., PageID#572-575.) Flagg and Williams claimed they had reasonable suspicion to stop Wright based on these events, prior to Wright vehicle leaving East 207 Street and prior to their realization he was driving a rental car. Flagg knew they did not have probable cause at that time. (*Id*, PageID#580, 587, 664-665; V. Williams Dep., PageID#871-873.)

Wright backed out of the driveway (Wright Dep., PageID#459) and drove toward Recher

---

Williams Dep., R. 24, PageID#867.) Flagg's Report and Flagg's and Williams' testimony did not place Chris on the porch, or note that Wright did not pull up Chris' driveway. (Wright Dep., PageID#458; Flagg Report – Dep Ex. 6, R.23, at PageID#800.)

[2] Prior complaints for the residence over the past year were all at least a month old by the time Flagg and Williams were surveilling, and only three of the six pertained to drugs. (Flagg Dep., PageID#725; Complaint Log - Dep. Ex. 7, R.23, PageID#803-804.)

Avenue. He took a right onto Recher[3] and then a left onto East 212th Street. (*Id*., PageID#460.) Wright used his turn signal when he turned onto Recher and when he turned onto East 212.[4] (*Id*., PageID#461.) Wright's car had automatic headlights. (*Id*., PageID#461-462.) As Wright drove down East 212 Street, he received a text from Kiyaka about their date. (*Id*., PageID#463.) Wright did not want to text and drive. He pulled into Ron Mecoli's driveway. Wright knew Ron from around the neighborhood. (*Id*., PageID#463-464; Mecoli Affidavit, attached as Pl. Ex. 1.)

Unbeknownst to Wright, Flagg and Williams followed him and stopped their vehicle on East 212. They planned to conduct a stop on Wright. Flagg testified that the reasonable suspicion for this stop was "leaving a known drug house" and the alleged traffic violations. (Flagg Dep., PageID#584-585.)  While in Mecoli's driveway, Wright read Kiyaka's message and was in the midst of texting her when he looked to his right, through the passenger window, and saw a man in dark clothing approaching. The man had a gun pointed at the passenger-side window. Lamar dropped his phone and put the car into reverse gear.[5] He thought he was being robbed.[6] (Wright Dep., PageID#467-469, 472.) But then Wright heard yelling: "Shut the car off!" and "Open the door!" He looked to his left, where he saw another man. Both men, on left and right, were yelling

---

[3] Flagg testified that until this point, he and Williams had not witnessed Wright engage in any criminal activity. (Flagg Dep., PageID#577-578.)

[4] Flagg and Williams claim Wright did not use his turn signal during either turn. They both failed to activate their body cameras so there is no footage to substantiate their claims. (Flagg Report – Dep Ex. 6, R.23, at PageID#800; Flagg Dep., PageID#578, 580-582; V. Williams Dep., PageID#975.) Flagg admitted that they did not have probable cause prior to witnessing the alleged traffic violations but also claimed that they planned to search Wright's vehicle from the moment he stopped on East 207th Street. (Flagg Dep., PageID#587-588, 605.)

[5] However, the vehicle never moved. (Wright Dep., PageID#469-470.)

[6] It was reasonable for Wright to be startled by Flagg's and Williams' approach. (Flagg Dep., R.23, PageID#658-659; V. Williams Dep., PageID#1054.)

at him. Wright saw a chain and a badge on one of the men and realized they were police. He immediately put the car in park and put his hands up. (Wright Dep., PageID#467-471.)

Flagg was on the driver's side of the car with his gun drawn. Flagg and Williams heard each other yelling or talking to Wright, but had no idea what the other was saying.[7] Without issuing any orders, Flagg yanked on the door. Wright complied and unlocked the door immediately. (Flagg Video - Def. Ex. C, R.28, at 00:01-00:03; Wright Dep., PageID#472; Flagg Dep., PageID#593-598, 615, 659; V. Williams Dep., PageID#899-900.) Flagg told Wright to turn the vehicle off. Wright complied immediately, turning the vehicle off as Flagg grabbed his left wrist. Wright put his right hand back up in the air.[8] (Wright Dep., PageID#473, 484; Flagg Dep., PageID#602; Flagg Video - Def. Ex. C, R.28, at 00:03-00:05.) He did not have his phone or anything else in his hand. (Wright Dep., PageID#474; V. Williams Dep., PageID#1004-1005.)

Flagg twisted Wright's left arm, forcing Wright's body forward into the steering column. Wright told him immediately and repeatedly, "You are hurting my arm!" Flagg said, "Let me see your hand." (Flagg Video - Def. Ex. C, R.28, at 00:05-00:14; Wright Dep., PageID#473, 482, 487.) Williams headed around to the driver's side. (V. Williams Dep., PageID#907.) Flagg and Williams were aware that Wright was not a small person, that there was not room to maneuver in the driver seat area, and that Wright would have struggled to present his right arm due to these factors. (Flagg

---

[7] Flagg has heard Williams yell when he is not in fear. (Flagg Dep., PageID#604.) Williams testified that it is not a good practice for two officers to give a person two sets of orders at the same time because it creates confusion. If a person complies with one set of orders and not the other, he is not committing a crime. (V. Williams Dep., PageID#916-917.)

[8] Williams testified that the basis for deploying his OC spray was that Wright moved his right hand down toward the center console three times – twice before the door opened and once afterward. He put his hands up afterward. (V. Williams Dep., PageID#1003-1004, 1020.) It is clear that the first two times would have been Wright placing the vehicle in reverse and then park, and the third was when he turned off the vehicle – per Flagg's orders.

Dep., PageID#603, 606-607; V. Williams Dep., PageID#930-931.) Further, Wright's mobility was limited due to his surgery and the colostomy bag and staples in his stomach. He tried to comply with Flagg's order, lifting himself up by pushing down on the armrest so that he could turn the backside of his body toward Flagg, permitting him to present his right arm. (Flagg Video - Def. Ex. C, R.28, 00:08-00:13; Wright Dep., PageID#473-476, 478, 484-485.) As Wright tried to present his right arm,[9] Flagg continued to twist Wright's left arm, saying, "Let me see your hand." Wright tried to explain he had a colostomy bag. (Flagg Video - Def. Ex. C, R.28, at 00:15-00:17.)

Though Flagg and Williams could have stepped back and ordered Wright out of the car, and though they gave Wright neither an order nor an opportunity to exit the vehicle, at that moment – as Wright tried to tell about his colostomy bag – Flagg discharged his taser and Williams sprayed a burst of OC. (Flagg Video - Def. Ex. C, R.28, at 00:16-00:23; Wright Dep., PageID#473; Flagg Dep., PageID#608-609, 614, 616; V. Williams Dep., PageID#928, 933.) Flagg admitted just one of these weapons constituted sufficient force to control Wright. (Flagg Dep., PageID#637, 638.)

Wright was immobilized by this dual-weapon attack. (V. Williams Dep., PageID#935.) He felt the shock of the taser. When the tasing stopped, as Flagg and Williams allowed Wright the chance to exit the vehicle, he got out and immediately complied. (Flagg Video - Def. Ex. C, R.28, at 00:23-00:27; Wright Dep., PageID#479, 511-512; Flagg Dep., PageID#625.) Flagg testified that Wright complied with this order – and with all of his orders. (Flagg Dep., PageID#630.)

While lying on the ground, Wright felt pain in his abdomen. He told Flagg and Williams

---

[9] Flagg's report states that "Wright was advised numerous times to give me his hands once I opened the door, but failed to comply." (Flagg Report – Dep Ex. 6, R.23, at PageID#800.) This claim is contradicted in the video – as Wright's left hand was immediately under Flagg's control. (Flagg Video - Def. Ex. C, R.28, 00:03-00:06.) Flagg claimed that when Wright "started resisting," it was at this moment that he decided to arrest Wright. Flagg admitted that until that point, he and Williams did not have probable cause to arrest Wright. (Flagg Dep., PageID#600.)

that he had "a shit bag on," indicating his colostomy bag. (Flagg Video - Def. Ex. C, R.28, at 00:27-00:28; Wright Dep., PageID#482, 488, 512.) Flagg testified that he could have obtained the information about Wright's surgery and colostomy bag before he put his hands on Wright and caused him harm. (Flagg Dep., PageID#632-633.) Williams handcuffed Wright on the ground.

In the aftermath of this event, Flagg told Williams, "I thought he had a gun," because Wright was allegedly reaching. (Flagg Video - Def. Ex. C, R.28, at 00:49-00:54; Wright Dep., PageID#480.) Flagg admitted that his claim Wright was reaching was a false statement: in his deposition, he testified that he did not see Wright reach down. (Flagg Dep., PageID#643.) Williams admitted he did not know if what he claimed was "resisting" was actually Wright attempting to shift his body so that he could present his right arm. (V. Williams Dep., PageID#946.)

The Use of Force Continuum is supposed to provide guidance to Euclid police officers on what level of force is appropriate. (Dep. Ex. 11 – Use of Force Continuum, R.23, PageID#839-840; Flagg Dep., R.23, PageID#734.) However, Flagg and Williams used OC spray and taser even though Wright only allegedly pulled away from Flagg – and did not push or wrestle with them – in violation of the Continuum.  (Flagg Dep., PageID#734-735.)

They sat Wright at the back of the Ford Edge. Wright told them his face was burning. The officers got water and Williams flushed Wright's eyes. (Wright Dep., PageID#480-481.) EMS arrived approximately five minutes later. (*Id*., PageID#490.) Wright told the EMS crew that he was still experiencing a burning sensation. He felt the OC spray so intensely in his nose that he felt like he had to vomit. He asked to blow his nose. (*Id*., PageID#490-491.)

While waiting to depart for the hospital, Williams interviewed Wright in the ambulance. Wright told Williams that he was insured and had a valid driver's license. He advised Williams that receipt for his license reinstatement was in the Ford Edge. (V. Williams Footage – Ambulance,

attached as Pl. Ex. 2, at 2:40-3:25.) Williams did not look for or verify these documents.

Defendants Flagg and Williams never saw Wright in possession of a weapon, drugs, or contraband, and never saw Wright cause any harm or threaten to harm to any person. Wright was unarmed. Williams admitted Wright did not actually pose any threat. (Flagg Dep., PageID#642, 702; V. Williams Dep., PageID#955, 1079-1080.) Flagg also admitted that he did not see Wright engage in any criminal conduct other than the alleged traffic offenses and "leaving the known drug house." (Flagg Dep., PageID#642.)

At the scene, Williams spoke with Ron Mecoli and Ashley Kelly, who lived at 780 East 212 Street. The conversation was captured on Williams' body camera. Mecoli and Kelly both clearly stated they did not see Wright's face. (V. Williams Dep., PageID#990) Mecoli never told Williams he did not want Wright on his property or that he thought Wright was trespassing. (Mecoli Affidavit, Pl. Ex. 1.) Flagg's report and both Defendants' testimony was that Flagg also claimed to have spoken with Mecoli. But Mecoli says he only spoke to one officer. Had Mecoli known it was Wright on his property, he would not have considered him to be trespassing. And though he is listed as the "victim" on Flagg's report, Mecoli is clear that he never told police he thought the man who was tased on his property was trespassing. (Flagg Report – Dep Ex. 6, R.23, at PageID#795; V. Williams Dep., PageID#959-960, 991-992; Mecoli Affidavit, Pl. Ex. 1.) Neither Mecoli nor his daughter told EPD Williams that they wanted to press charges. (V. Williams Dep., PageID#1038.)

Flagg rode in the ambulance with Wright to the hospital, where he was seen by a doctor due to bleeding around his colostomy bag. (Wright Dep., R.22, PageID#492.) The doctor said Wright was fine but wanted to run tests. While at the hospital, Wright asked for water.[10] Flagg

---

[10] Also while at the hospital, Wright again informed police that his receipts for the SR-22 insurance

came back with a cup with red liquid inside, some kind of dye. Wright took a sip, but then refused to drink it. (*Id.*, PageID#493.) Wright was wheeled to an x-ray room – but was concerned, given all of his recent medical treatment, and refused, saying "I don't want all this radiation on my skin." (*Id.*, PageID#495-496; V. Williams Dep., PageID#970.)

The police officers present during this event got mad, and said, "Fuck this. We can just restrain him and make him have to get a CAT scan."[11] Police demanded a CT of Wright's abdomen, but the treating doctor consulted the hospital's legal department, who advised that a coerced scan was not permissible. Wright signed a refusal form. No scan was performed. (Wright Dep., PageID#496, 499; Medical Records, attached as Pl. Ex. 3.) The officers were mad and told Wright they were going to charge him. (Wright Dep., PageID#499.) Though he was still burning from the OC spray[12], Wright was discharged and taken to the Euclid Jail. (*Id.*, PageID#500, 502.)

Once at the Euclid Jail[13], Flagg and Williams charged Wright with multiple traffic offenses, including driving without a license, suspended license, failing to signal before changing course,

---

bond and license reinstatement fee were in the Ford Edge. (Wright Dep., PageID#498-499.)

[11] Flagg's report contains an admission that the officers attempted to convince Wright to submit to a CT Scan. (Flagg Report – Dep Ex. 6, R.23, at PageID#801.)

[12] During his time in the hospital, Wright told medical staff he still had OC spray on his body. His eyes were swollen from the effects of the mace. Many of the doctors would not even stay in the room because the OC spray made their eyes teary. While at the hospital, Wright expressed concern about going to the bathroom and the possibility of transferring OC spray to his genitals. When he expressed this to police, they laughed at him. (Wright Dep., R.22, PageID#502-503.)

[13] It was within Flagg's and Williams' discretion as to whether they would cite Wright and release him or whether they would subject Wright to a "physical arrest," leading to being booked into the jail and requiring bond to be posted. Typically, Euclid officers "cite and release" in cases involving purported drug abuse/possession or trespassing, and "physical arrests" are used when a defendant has committed an act of violence or there is a danger of the crime happening again. (Murowsky Dep., R.25, PageID#1131-1134.) Even though Wright did not commit an act of violence and there was no danger of repeat behavior, he was subjected to physical arrest in this case, in violation of EPD policies. (*See* Affidavit and Report of Roy Taylor, attached as Pl. Ex. 6, at ¶20.)

and a headlights offense – which Williams advised Flagg they should charge, though Flagg himself did not observe the offense and though Wright's headlights are on and visible in Flagg's body camera footage and daylight was still bright during these events.[14] (Flagg Dep., PageID#650, 654-655; Traffic Citations – Dep. Ex. 3, R.23, PageID#790; Flagg Video - Def. Ex. C, R.28, at 0:00-0:01, 00:18-00:24.)  Flagg and Williams also charged Wright with obstructing official business and resisting arrest – the basis for both was Wright's alleged resistance with his right arm. They offered this justification while admitting that officers have a duty to give people an opportunity to comply before determining that they are resisting. They also charged him with criminal trespass for stopping in Mecoli's driveway. (Flagg Dep., R.23, PageID#669-674, 681-682; V. Williams Dep., PageID#996; Complaints – Dep. Ex. 4, R.23, PageID#791-792.) Flagg and Williams initiated prosecution against Wright, even though officers have a duty not to initiate or influence prosecutions where there is no probable cause. (Flagg Dep., PageID#682, 728; V. Williams Dep., PageID#996, 1056.)

Flagg and Williams also wrote reports. Flagg completed his report at 10:59 PM and Williams completed his report at 11:33 PM on November 4, 2016. (Flagg Report – Dep Ex. 6, R.23, at PageID#800-802; Murowsky Dep., PageID#1153-1154.) Though no drugs were found on Wright's person or vehicle, and though he was not charged with a drug offense, Flagg designated his report as a "drug investigation." Flagg knew this designation would result in Wright being subjected to additional searches while in jail, even though officers have a duty not to influence jail staff to detain people beyond the time they post bond. (Flagg Report – Dep Ex. 6, R.23, at PageID#795; Flagg Dep., PageID#702, 722, 728, 753.) Flagg and Williams also completed

---

[14] Williams requested this charge in spite of his admission that it was light enough that he did not need to use his flashlight at the time of this incident. (V. Williams Dep., R.24, PageID#861.)

"Resistance/Response Reports," and both indicated that Wright had presented just "mild resistance" prior to their use of force. (Dep. Ex. 5 - Resistance/Response Reports, R.23, PageID#793-794; Murowsky Dep., PageID#1174-1175; Flagg Dep., PageID#687-688.)

Wright was booked into the Euclid Jail at 10:49 PM. During the booking process, he spoke with a woman correctional officer, who permitted him to make a phone call for bond. Wright called his cousin, Frank Brown, who came to the Jail and posted bond around 11:30 PM or midnight. (Wright Dep., PageID#500-501, 504-505; Jaenke Dep., R.26, PageID#1283, 1290; Booking Card - Jaenke Dep. Ex. 22, attached as Pl. Ex. 4.) Bond payment and paperwork concerning charges against Wright were processed by EPD Sgt. Craig Murowsky.[15] Murowsky signed the completed bond paperwork, requiring a total bond posted for all four charges in the amount of $905.00. (Murowsky Dep., PageID#1104-1106; Bond Forms – Dep. Ex. 17, R.25, PageID#1225-1228.) Murowksy testified that bond for Wright was posted on November 4, 2016, sometime between 11 PM and midnight.[16] (Murowsky Dep., PageID#1108-1111; *see also* Bond Forms – Dep. Ex. 17, R.25, PageID#1225-1228.) Murowsky also testified that if bond is posted while a person is still in the Euclid Jail, that person would normally be released and would walk out of the Jail in an hour or less. (Murowsky Dep., PageID#1140-1141.) But after Wright's cousin posted bond, the woman correctional officer told him, "Hold on. We have to take you downtown." He asked, "For what?" She said, "The two officers said they want you to go through a machine, a body machine," and that they "want[ed] [Wright] to do a scan to see if [he] had anything in his body." (Wright Dep.,

---

[15] When Murowsky started his shift at 11 PM, Flagg and Williams were completing reports. (Murowsky Dep., PageID#1111-1112.) Murowsky was officer-in-charge. (*Id.* at PageID#1113.)

[16] Murowsky testified that if a defendant is in Euclid Jail when he completes bond paperwork, he would normally have contact with that defendant. (Murowsky Dep., PageID#1108.) Nonetheless, he had no contact with Wright in this case. (*Id.*, PageID#1103, 1109.)

PageID#501-502, 505.)

Meanwhile, after reviewing Flagg's and Williams' reports, and approving their use of force[17], Murowsky "deputy-clerked" the complaints by signing them. (Murowsky Dep., PageID#1145-1146, 1148, 1163.) By signing those complaints, Flagg and Williams swore that the information contained in the citations was true and accurate. (*Id.*, PageID#1147.)

Officers were dispatched to pick up Lamar Wright at the Euclid Jail at 12:47 AM. (Jaenke Dep., R.26, PageID#1305-1306; Radio Traffic – Jaenke Dep. Ex. 23, attached as Pl. Ex. 4.) Wright was subsequently transported downtown to the Cuyahoga County Jail.[18] Wright was not transferred out of the Euclid Jail until approximately 1:00 AM on November 5, 2016. He arrived at the downtown County Jail at 1:05 AM. (Jaenke Dep., PageID#1299, 1307; Corporal Log – Dep. Ex. 19, R.25, PageID#1230-1231; Radio Traffic – Jaenke Dep. Ex. 23, attached as Pl. Ex. 4.)

When Wright arrived downtown, Jail staff asked, "Is that Mr. Wright?" The transport

---

[17] Murowsky reviewed Flagg's and Williams' reports on the night Lamar Wright was tased and OC sprayed. He also reviewed Flagg's and Williams' "Resistance/Response Report," which is a "use of force form." After looking at both reports and the body camera footage, he approved the amount of force they used against Wright and approved charges against Wright. (Murowsky Dep., PageID#1155, 1158, 1161-1164.) He found no discrepancies between the video and the written reports. (*Id.*, PageID#1158, 1165.) Murowsky does not look at the Department's policy on Use of Force when he reviews officers' uses of force. He has also never disapproved of a single use of force incident by a Euclid police officer. And he could only recall a single incident over the course of his career when a use of force was not approved. (*Id.*, PageID#1167-1169.) Nonetheless, Murowsky testified that he probably would have waited for a marked car rather than approach Wright's vehicle under these circumstances, and indicated that he did not believe there was an immediate threat of flight or any kind of physical threat when Flagg and Williams approached Wright's vehicle. (*Id.*, PageID#1182-1183.)

[18] Murowsky testified that it is "not normal" for a prisoner at the Euclid Jail Annex to be transferred downtown after the bond paperwork is completed, and that such a transfer "shouldn't happen." (Murowsky Dep., PageID#1141-1142.) Cuyahoga County Jail Sgt. Jaenke testified that no person should be transferred downtown after bond is posted absent a county warrant. Jaenke specifically testified that if bond for Wright was posted before midnight on November 4, 2016, he should not have been transferred downtown. (Jaenke Dep., PageID#1264, 1308.)

officer replied, "Yeah," and downtown Jail staff said, "Your name has been all through the scanners." Though there was no reason to believe that Wright was secreting anything in his body, he was asked whether he ingested any drug or foreign substance and whether he sequestered any drug or foreign substance on his person or in any body cavity. (B. Williams Dep., R.21, PageID#374-375, 384.) Wright was then subjected to a full-body scan. (Wright Dep., PageID#501-502, 507.) The scan showed that Wright was not harboring anything in or on his person – "nothing was seen." The downtown Jail officer said to Wright, "They fucked up," referring to the Euclid Police Department. (B. Williams Dep. Ex. 24, PageID#406; Wright Dep., PageID# 508.) While downtown, Wright told officers he still had OC spray on his body. They replied, "Your bond has been paid. We just needed to do this and you will be released." (Wright Dep., PageID#509.)

Wright was subsequently released from jail at approximately 3:55 in the morning. (Jaenke Dep., PageID#1291-1292; Booking Card – Jaenke Dep. Ex. 22, attached as Ex. 4.) His cousin Frank picked him up. (Wright Dep., PageID#509.) He had bruises on his wrists from handcuffs and Flagg twisting his arm. The site where the taser barb entered his skin scarred. (*Id.*, PageID#519-522.) His body still burned from the effects of the OC spray at the time he was released. The OC spray was so powerful that it ate a hole through his shirt. Wright's eyes were puffy. When he got home, he took a shower, but that did not alleviate the pain. His girlfriend called poison control, and they advised to pour milk on his face. The milk helped. Nonetheless, he felt pain into November 6, 2016. (*Id.*, PageID#510-513.)

Though he recovered from the physical effects of this assault, Wright still faced ongoing consequences from this encounter: prosecution against him lasted over seven months. (Criminal and Traffic Dockets, attached as Pl. Ex. 5; Wright Dep., PageID#517.) Eventually, on June 21, 2017, all charges were dismissed. The statute of limitations for charges previously filed against

Wright passed on November 4, 2018. No charges were ever re-filed against him. (Criminal and Traffic Dockets, Pl. Ex. 5; Wright Dep., PageID#518-519; Ohio Rev. Code §2901.13.) Wright still has bad dreams about this incident and is frightened when he encounters police. (Wright Dep., PageID#527.) Neither Flagg nor Williams were investigated or disciplined for their conduct on November 4, 2016. (Flagg Dep., PageID#742; V. Williams Dep., PageID#1070.)

## II.   CITY OF EUCLID POLICIES, PRACTICES, AND CUSTOMS

The City of Euclid's police department does not have policies concerning the following:

- Plainclothes officers making arrests (Flagg Dep., R.23, PageID#749-750);
- When and how to make accommodations for people with medical or physical limitations (Flagg Dep., R.23, PageID#749-750);
- When an officer can show or display a firearm;
- Handcuffing drivers inside or outside of vehicles;
- Extracting or removing people from vehicles;
- OC spray use (Flagg Dep., R.23, PageID#641; V. Williams Dep., R.24, PageID#1073-1074); and
- Simultaneous deployment of TASER with OC spray by EPD officers (compared with the TASER policy which prohibits Taser use if a subject has been sprayed with OC by another agency or department); (V. Williams Dep., R.24, PageID#1049; Flagg Dep., R.23, PageID#748; Taylor Report, Pl. Ex. 6, at ¶ 43, citing EPD Policy 08-001-425).

The TASER policy oversight "permitted Flagg and Williams to use a dangerous and greater level of force than other officers would have used if facing the same, or similar, circumstances." (Taylor Report, Pl. Ex. 6, at ¶42-43; *see also* EPD Manual – Meyer Dep. Ex. 14, attached to Meyer Dep. at Pl. Ex. 9; 2008 Force Policy - Meyer Dep. Ex 13, attached to Meyer Dep. at Pl. Ex. 9.) Likewise, the EPD "offers little training to its officers on general use of force principles, and offers no relevant training for the specific uses of force at issue in this case." Examples include:

- Plainclothes officers making arrests or conducting traffic stops;
- Making accommodations for people who have physical disabilities or medical limitations;
- Handcuffing individuals while inside a vehicle, though in-vehicle handcuffing arises often in the course of EDP officers' duties;
- Extracting or removing people from vehicles;

13

- Proper use of OC spray;
- Deployment of more than one weapon at a time;
- Use of body camera.

(Taylor Report, Pl. Ex. 6, ¶42; Flagg Dep., PageID#753 ; V. Williams Dep., PageID#894.)

The lack of policies and training is systemic, leaving "EDP officers without specific tools and guidance necessary to handle situations or circumstances that are likely to arise in EDP officers' regular policing duties, and which occurred in Defendants' interactions with Plaintiff in this case." (*Id*.) In another case against Euclid, Lt. Mitch Houser testified that though he has been the department's training officer since October 2016, he does not identify gaps in training or policy or take steps to develop lesson plans around those gaps. The EPD does not have an evaluation tool in place to ensure or check that Euclid officers complete required training. Though EPD policy on training requires a committee to identify training needs and set objectives, there has never been such a committee. (Deposition of Mitch Houser, *Stewart v. City of Euclid, et al*., Case No. 1:17-CV-02122, attached as Pl. Ex. 7, at pp. 17-20, 25-27; EPD Manual - Meyer Dep. Ex 13 and 14, attached to Meyer Dep. at Pl. Ex. 9, at Policy 06-001-690.)

Further, the EPD's use of force training violates nationally-accepted standards and protocols. Shortly after Wright's arrest, EPD hosted a training for officers on defensive tactics. (Defensive Tactics Training - Dep. Ex. 10, R.23, PageID#808-838.) The first slide of the presentation (PageID#808) shows a police officer in riot gear striking a person on the ground with hands in the air, with the caption, "serving and protecting the poop out of you." Flagg took this training, regarding tactics used against Wright, in the first quarter of 2017. (Flagg Dep., PageID#729-730-731; V. Williams Dep., PageID#1059.) Murowsky said he did not think the image "convey[s] that [the EPD] beat[s] the hell out of people," but acknowledged he did not know what other message could possibly be taken from the training. (Murowsky Dep., PageID#1200.)

14

The same training included a screening of a video of a Chris Rock comedy skit, "How Not to Get Your Ass Kicked by the Police," located at https://www.youtube.com/watch?v=uj0mtx XEGE8. (R.23, PageID#824; V. Williams Dep., PageID#1063-1064.) Murowsky testified that the video had been a topic of discussion for EPD Officers and was "humorous," and "[a] lot of it's related to things that we've [Euclid Police Officers] have experienced." (Murowsky Dep., PageID#1194-1195.) The video depicts different vignettes involving officers beating black people. EPD Chief Scott Meyer considered this training to be "appropriate." (Deposition of Scott Meyer, *Stewart v. City of Euclid, et al*., Case No. 1:17-CV-02122, attached as Pl. Ex. 8, at pp. 102-104, 127-129, 136-140; Taylor Report, Pl. Ex. 6, ¶45.)  "[S]igns of racial profiling are present in the surveillance, seizures, and search of Mr. Wright in this case," and signs of tolerance of racism are evident in this training, and historically in the EPD: Murowsky admits EPD has a history of racism among officers reaching back to the 1990s, including comments from EPD officers about "people who live like animals." (Taylor Report, ¶47; Murowsky Dep., PageID#1206-1207.) He was not aware of a single EPD officer reprimanded for racist comments. (*Id*., PageID#1208.)

The EPD's lack of meaningful review of use of force complaints is evident in the department's practice to not initiate an internal affairs investigation in response to allegations against officers brought to the attention of the department via lawsuits. Lawsuits are not added to officers' personnel files. Since becoming Chief, Meyer has not found any civilian complaint concerning use of force, false arrest, or illegal searches to be founded. Murowsky, who reviews uses of force, has never disapproved an officer's use of force report, and could only remember one time that any EPD officer disapproved of an officer's force. (Taylor Report, ¶48; Deposition of Scott Meyer, attached as Pl. Ex. 9, at pp.55-58, 65, 111; Murowsky Dep., PageID#1100, 1209-1210.) Yet, the EPD has a track record of excessive force. For example, around the same time as

15

Wright's case, another man was brutalized by an EPD officer: Emerius Spencer was kicked in the face and tased during an arrest for possession of less than a gram of marijuana. The same officer was also caught on video brutally beating Richard Hubbard during a traffic stop in August 2017. (*See* Spencer/Hubbard Cleveland.com articles, Pl. Ex. 10; *see also* Hubbard video, available at https://www.youtube.com/watch?v=ywmrqwLLKJE.)

## LAW AND ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the evidence shows no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court must view evidence in a light most favorable to Plaintiff and draw all reasonable inferences in his favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

### II.  PLAINTIFF'S CASE AGAINST FLAGG AND WILLIAMS MUST PROCEED TO TRIAL.

Defendants Flagg and Williams are not entitled to qualified immunity and this case must go to trial.

#### A.  Flagg and Williams Violated Lamar Wright's Constitutional Rights.

##### 1.  *Wright's Fourth Amendment Unreasonable Search and Seizure Claims against Flagg and Williams Must Survive Summary Judgment.*

Plaintiff's First, Third, and Fourth Claims for Relief address unreasonable searches and seizures in violation of Wright's Fourth Amendment rights. These violations fall into three categories: (1) the use of – or failure to prevent – excessive force; (2) false arrest; and (3) extended detention. Disputed material facts underlie these claims, and Defendants' Motion must be denied.

a. <u>Flagg and Williams Used Excessive Force against Wright.</u>

Courts evaluate a claim of excessive force "during the course of seizure … under an objective reasonableness standard." *Morrison v. Bd of Trs. Of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). "[*A*]*ll* claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989) (emphasis in original). This issue requires balancing the nature and quality of the intrusion on an individual's Fourth Amendment interests against the government's interests, and a determination of whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him. *Id.* at 396-397. This determination rests upon "whether the totality of the circumstances justifies a particular sort of seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006).

The proper application of Fourth Amendment reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. This is an objective test, "'judged from the perspective of a reasonable officer on the scene…'" *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902-903 (6th Cir. 1998).

Police practices expert Roy G. Taylor opined on Flagg's and Williams' use of force, among other issues in this case. Taylor found that Flagg's taser use demonstrated a plainly incompetent use of force, and constituted a greater level of force than other officers would have used. Flagg's taser use violated EPD TASER training and the Use of Force Continuum, which require reserving taser for situations involving wrestling or pushing an officer. (*See* Report of Roy Taylor, Pl. Ex. 6, at ¶28-31; Dep. Ex. 11 – Use of Force Continuum, R.23, PageID#839-840.)

Likewise, Williams' OC spray use at point-blank range – not three feet as he testified– was dangerous, and violated nationally-accepted standards, including limiting OC to overcoming violent or threatening behavior, which were not present here. His OC spray use constituted a greater level of force than other officers would have used, and was plainly incompetent. (Taylor Report, Pl. Ex. 6, at ¶32-33, 35-36; Dep. Ex. 11 – Use of Force Continuum, R.23, PageID#839-840.) The use of OC spray and taser together was dangerous, contrary to generally-accepted policing practices, and constitutes an elevated level of force. (Taylor Report, at ¶34.)

Under this set of facts, Plaintiff's excessive force claim against Flagg and Williams must survive summary judgment. From the very start of the encounter, Defendants engaged in unjustified violence toward Wright starting when they pulled their guns on him without any sign of danger to themselves or others. *See,* e.g., *Croom v. Balkwill*, 645 F.3d 1240, 1253 n. 17 (11th Cir. 2011). After brandishing firearms, Flagg and Williams used far more force than was necessary to effect an arrest (though, as discussed below, the arrest was unlawful, as well). *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) ("Cases in [the Sixth Circuit] clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest."); *Meirthew v. Amore*, 417 F. App'x 494, 498 (6th Cir. 2011) (even where some force was justified, the amount of force utilized must be reasonable); *Miller v. Sanilac Cnty.,* 606 F.3d 240, 253 (6th Cir. 2010) (where offense was non-violent and arrestee posed no immediate safety threat, jury was entitled to hear excessive force claim).

Wright had not engaged in any violent or serious crime prior to the use of force. He never posed any threat to any of the officers. Further, the Court is obligated to "not simply accept what may be a self-serving account by the police officer, and must instead look at circumstantial evidence that, if believed, would tend to discredit the police story." *Jefferson v. Lewis*, 594 F.3d

454 (6th Cir. 2010). These Defendants' "fear" and uses of force were predicated on: (1) Williams' alleged perception that Wright was "reaching down" – which Flagg admits he did not witness – and to the extent that Williams saw Wright "reaching down," Wright was complying with Flagg's orders; and/or (2) Wright allegedly "resisting" Flagg's orders and attempts to grab his right arm, even though Flagg and Williams both admit that Wright was a larger person in a small space who would have trouble presenting his right hand to Flagg. Their justifications are a total farce. Per Wright's testimony, and as evident in Flagg's body camera video, Wright did not resist. Instead, he was trying to comply to the best of his ability, given his medical and physical limitations. At every opportunity to comply with an order, Wright did so immediately. Flagg even admitted at one point in his deposition that Wright complied with all of his orders. (Flagg Dep., PageID#630.) Flagg and Williams never gave Wright an opportunity to present his right arm for handcuffing, or to exit the vehicle with any dignity. Instead, they attacked him.

At most, an officer is "justified only [using] the amount of force that a reasonable officer in the heat of the moment could have believed was needed." *Norton v. Stille*, 526 Fed. Appx. 509, 512-513, 2013 FED App. 0477N (6th Cir. 2013), citing *Shreve,* 453 F.3d at 687. Flagg's and Williams' use of force far exceeded this standard. Thus, as in *Norton,* "the [officers'] interest in [controlling the situation] could not have justified" the violence they used against him when he posed no danger. *Norton* at 513. Defendants' claims of "resistance" are hardly a unique defense or coverup for the use of excessive force.[19] The disputes between Defendants' accounts and Wright's

---

[19] *See*, e.g., Sasha Goldstein, "Police dash cam video exonerates New Jersey man, leads to indictment of cops," New York Daily News (Feb. 25, 2014), available at http://www.nydailynews.com/news/crime/police-dash-cam-video-exonerates-nj-man-implicates-cops-article-1.1701763; Trace William Cowen, "Alabama Cop Admits He Lied to Federal Officials as Part of Police Brutality Cover-Up," Complex (July 30, 2015), available at http://www.complex.com/pop-culture/2015/07/huntsville-alabama-cop-admits-police-brutality-cover-up.

account require that this case be resolved by a jury. Flagg and Williams violated Wright's constitutional rights by using excessive force, and they are not entitled to summary judgment.

      b.   <u>Flagg and Williams Failed to Intervene to Prevent the Use of Excessive Force.</u>

Further, Flagg and Williams violated Wright's constitutional rights by failing to protect him from the each other's use of force. A "police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Williams and Flagg were practically on top of each other as they both used unjustified force against Wright. They had the opportunity to verbally or physically intervene in the other's use of force. They both failed to do so. They both admit Wright committed no crime other than the falsified traffic violations they concocted, which Wright and the video dispel. Wright was not resisting – and they knew it. They are liable for failure to intervene. A jury must decide this issue.

      c.   <u>Flagg and Williams Falsely Arrested Wright.</u>

Genuine disputes also remain about whether Defendants unlawfully arrested Wright. The elements of a federal false arrest claim include an arrest effected without a warrant and without probable cause. *Thacker v. City of Columbus*, 328 F.3d 244, 255 2003 FED App. 0127P (6th Cir. 2003). There is no dispute over the lack of a warrant. The only remaining inquiry is whether Defendants had probable cause to arrest. "[A]ny arrest without probable cause violates the Fourth Amendment." *Thacker*, 328 F.3d at 256. When deciding whether an arrest is supported by probable cause, the Court must "look to the totality of the circumstances" and "the information possessed by the arresting officer at the time of the arrest." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008). "In general, the existence of probable cause in a § 1983 action presents a jury question,

unless there is only one reasonable determination possible." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002); *see also Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (the court "must determine whether a jury could conclude that a reasonable officer could have believed that [the arrested individual] had probably committed or [was] committing a crime.").

Here, when Wright left Chris' house on East 207 Street, Flagg admitted they did not have probable cause to arrest. (V. Williams Dep., PageID#872-873; Flagg Dep., PageID#587, 664-665.) Next, the alleged traffic violations are subject to disputes concerning probable cause: there is contradictory testimony on whether Wright used turn signals, and the video shows his headlights were on *and* daylight was still bright at the time Flagg and Williams approached Wright's vehicle. Further, there are competing facts concerning whether Wright was driving without a license and whether Defendants had information available to them that his license was, indeed, valid. Moving on, Ron Mecoli's affidavit makes clear that there was no colorable trespass charge. And both the obstruction and resisting charges were predicated on Wright allegedly pulling his arm away. As explained above, at best, Flagg's and Williams' claim on this issue is subject to disputed facts – even though the video and Wright's testimony show that he was not resisting and instead was attempting to comply to the best of his ability. There was no probable cause for any of the offenses allegedly underlying Wright's arrest.

Further, for these same reasons, it is also clear that Flagg and Williams did not have reasonable suspicion to stop Wright at all. Reliance on vague, stale complaints passed on by word of mouth about alleged drug activity at a house where Wright briefly stopped – in plain view of the officers, who admit they did not see any criminal or even potential narcotics activity – to talk to a friend who was sitting on the porch simply does not give rise to reasonable suspicion. (*See also* Taylor Report, Pl. Ex. 6, at ¶ 20-21.) But even if the Court were to view this case in a light

most favorable to Defendants to find reasonable suspicion, this does not mean these Defendants lawfully arrested Wright. Probable cause is conspicuously absent here.

"[D]efenses which negate the existence of a crime should similarly negate probable cause." *Gumble v. Waterford Twp.,* 171 Fed. Appx. 502, 507, 2006 U.S. App. LEXIS 7353, *10-11, (6th Cir. 2006), citing *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir. 2003). There was no reasonable suspicion to stop Wright, and no probable cause to arrest. Likewise, there was no probable cause for the extended detention of Wright beyond the initial encounter, including extending detention after he posted bond. Flagg caused this extended detention by designating Wright's case as a "drug investigation," despite the utter absence of drugs or contraband on Wright's person or in his vehicle. Flagg knew that using this designation would lead to additional searches at the jail. Even after Wright posted bond, he was improperly transferred downtown – per the testimony of Jaenke and Murowsky – where he was subjected to a full-body scan. The delay was unnecessary and was the result of improper motivation. Flagg and Williams falsely arrested Wright and Flagg unjustifiably extended Wright's detention. A jury must be permitted to decide.

### 2. Wright's Federal Malicious Prosecution Claim against Flagg and Williams Must Survive Summary Judgment.

Plaintiff's Second Claim for Relief addresses Flagg's and Williams' malicious prosecution of Wright. Malicious prosecution constitutes a separate cognizable claim distinct from unlawful arrest. *See Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). The claim has four prongs. First, "the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute." *Id*. Second, the plaintiff must show a lack of probable cause for the prosecution. Third, the plaintiff must show a deprivation of liberty resulting from a legal proceeding. Fourth, the proceeding must resolve in the plaintiff's favor. *Id.* at 308-309.  Probable cause to prosecute must be

established for *each* charge to preclude a malicious prosecution claim. *See Mott v. Mayer*, 524 F. App'x 179 (6th Cir. 2013), citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010), *McKinley v. Mansfield*, 404 F.3d 418, 445 (6th Cir. 2005). Probable cause is a jury question, unless there is only one reasonable determination. *Thacker,* 328 F.3d at 255.

To the first prong, Flagg and Williams both admit that they "made, influenced, or participated in the decision to prosecute."  The first prong is satisfied.

To the second prong, there was no probable cause underlying any of the charges Flagg and Williams filed against Wright (or, at the very least, there are disputed material facts concerning probable cause). Moreover, "individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute the plaintiff' by, for example, 'knowingly or recklessly' making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants." *King v. Harwood*, 852 F.3d 568, 582-583 (6th Cir. 2017), citing *Webb v. United States*, 789 F.3d 647, 660, 665 (6th Cir. 2015) (holding officer violated clearly established right to be free from malicious prosecution by fabricating evidence that defendant was a drug dealer); *see also Malley v. Briggs*, 475 U.S. 335, 340-45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (affirming lower court's holding that "an officer who seeks an arrest warrant by submitting a complaint and supporting affidavit to a judge is not entitled to immunity unless the officer has an objectively reasonable basis for believing that the facts alleged in his affidavit are sufficient to establish probable cause"). "[F]alsifying affidavits and fabricating evidence … constitute unprotected acts." *Sanders v. Jones*, 845 F.3d 721, 734 (6th Cir. 2017), citing *Rehberg v. Paulk*, 566 U.S. 356, 1507 n.1 (2012). The record here contains clear evidence that Defendants fabricated evidence and falsified reports. The second prong is satisfied.

As for the third prong, due to Flagg's and Williams' decision to prosecute, Wright suffered a deprivation of liberty beyond initial seizure, including time spent in custody in the hospital, and in custody at the jail, both before and after posting bond. Further, upon posting bond, Wright was still subject to pretrial conditions – until the case against him was dismissed.[20] This prong is met.

Finally, the prosecution was resolved in Wright's favor when all charges against him were dismissed seven months later. Though Defendants' claim that a voluntary dismissal by the prosecutor does not satisfy the fourth prong, and that Plaintiff must show malice, they are wrong. First, concerning the malice argument, proof of malice is not required in federal malicious prosecution claims. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). Second, concerning voluntary dismissal, they cite to *LeFever v. Ferguson*, 956 F.Supp.2d 819 (S.D. Ohio 2013) for this proposition. But *LeFever* – though a Southern District case – addresses an *Ohio law* claim for malicious prosecution – not a federal claim. No such limitation exists in federal claim precedent. Further, *LeFever* involved dismissed charges that had already been indicted by a grand jury, which gives rise to a rebuttal presumption of probable cause. Here, there was no grand jury and no indictment, and instead Flagg and Williams were the only initiating force behind the charges – which they commenced without probable cause. Finally, the record here is clear that Wright was, indeed, innocent of the charges filed against him. Further, the statute of limitations has also passed and no charges were ever refiled. *See* Ohio Rev. Code §2901.13. Wright satisfies the fourth prong.

Flagg and Williams maliciously prosecuted Wright. A jury must decide this claim.

**B. Wright's Federal Claims Were Clearly Established on November 4, 2016, and Flagg and Williams Are Not Entitled to Qualified Immunity.**

---

[20] A defendant is still "seized" when released from pretrial confinement because of conditions of release. *See Albright v. Oliver*, 510 U.S. 266 (1994). Justice Ginsburg's concurring opinion, joined by Justice Scalia, explains this principle. *Id.* at 279. *See also Fisher v. Dodson*, 451 F. App'x 500, 502 (6th Cir. 2011); *Gallo v. Philadelphia*, 161 F.3d 217, 219, 225 (3d Cir. 1998); *Evans v. Ball*, 168 F.3d 856, 861 (5th Cir. 1999); *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997).

In evaluating qualified immunity, courts ask two questions: (1) "whether the facts that a plaintiff has … shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In this analysis, the Court takes the facts "in the light most favorable to the party asserting the injury." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Both questions resolve in favor of Wright.

Plaintiff has already established that indeed his constitutional rights were violated, as discussed above. The first prong of the qualified immunity analysis is therefore satisfied. To the second prong, "[t]his Court's case law do[es] not require a case directly on point for a right to be clearly established." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (per curiam). *See also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015)(citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Nonetheless, Defendants cannot argue that the rights at issue here were not clearly established in 2016. Defendants were on notice that their conduct was unconstitutional at that time because the rights were clearly established as of, *inter alia*, the following decisions:

1. **Right to be free of excessive force:**

   - *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681 (6th Cir. 2006) ("[P]eople who pose no safety risk to the police [have a right] to be free from gratuitous violence during arrest.");
   - *Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007) (When force is used on a detainee who poses no threat, force is excessive and violates 4th Amendment rights.);
   - *Miller v. Sanilac Cnty.,* 606 F.3d 240 (6th Cir. 2010) (where offense was non-violent and arrestee posed no immediate safety threat, jury was entitled to hear excessive force claim where plaintiff was slammed against vehicle and kicked during traffic stop).
   - *See generally Norton v. Stille*, 526 Fed. Appx. 509 (6th Cir. 2013);
   - *Meirthew v. Amore*, 417 F. App'x 494 (6th Cir. 2011) (even where some force was justified, the amount of force utilized must be reasonable).

25

2. **Right to be free from arrest without probable cause:**

- *Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002) ("Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional");
- *Thacker v. City of Columbus*, 328 F.3d 244, 256 2003 FED App. 0127P (6th Cir. 2003). ("[A]ny arrest without probable cause violates the Fourth Amendment.").

3. **Right to be from malicious prosecution:**

- *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) (malicious prosecution proven where officers provide prosecutor with investigatory materials containing knowing misstatements, and prosecution relies on the falsehoods in proceeding against plaintiff);
- *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) (clearly established right to be free from malicious prosecution where evidence is fabricated that subject is a drug dealer);
- *Malley v. Briggs*, 475 U.S. 335 (1986) ("an officer who seeks an arrest warrant by submitting a complaint and supporting affidavit to a judge is not entitled to immunity unless the officer has an objectively reasonable basis for believing that the facts alleged in his affidavit are sufficient to establish probable cause").

Here, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Flagg and Williams had "fair notice." *Hope v. Pelzer*, 536 U.S. 730 (2002). Their motion must be denied.

**C.  State Law Claims against Flagg and Williams Survive Summary Judgment.**

**1.  *Wright's State Malicious Prosecution Claim Must Survive Summary Judgment.***

Under Ohio law, "'the elements of the tort of malicious criminal prosecution are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in the favor of the accused." *Thacker*, supra, 328 F.3d at 260. Though "malice is an essential element in actions for malicious prosecution, 'the want of probable cause is 'the real gist of the action.'" *Id.* at 261, citing *Tourlakis v. Beverage Distribs., Inc.*, 2002 Ohio 7252, 2002 WL 31875970, at *4 (Ohio. Ct. App. 2002).  "Ohio law defines probable cause in substantially the same way that it is defined under the Fourth Amendment." *Id.* "[P]robable cause is assessed based on the facts and circumstances known at the time the offense is charged[.]" *Thacker*, 328 F.3d at 260-61 (6th Cir. 2003). This determination "requires inquiry into the facts and circumstances

actually known to or reasonably within the contemplation of the defendant at that time." *Id.*

The question of probable cause for prosecution here is subject to genuine dispute. The case was terminated in Wright's favor. *Ash v. Ash*, 72 Ohio St.3d 520, 522 (1995). Probable cause is a jury question, unless there is only one reasonable determination, and the determination of the existence or absence of malice and probable cause is a factual question to be resolved initially by the trier of fact. *See*, e.g,. *Cincinnati Enquirer, Inc. v. Abney*, 1st Dist. Hamilton No. C-870232, 1988 Ohio App. LEXIS 1214; *Thompson v. R&R Serv. Sys.*, 10th Dist. Franklin No. 96APE10-1277, 96APE10-1278, 1997 Ohio App. LEXIS 2677 (1997); *Canton Provision Co. v. St. John*, 52 Ohio App. 507, 3 N.E.2d 978 (5th Dist. 1936). For the same reasons raised in support of Plaintiff's federal malicious prosecution claim, the state law claim must be decided by a jury.

### 2. Wright's Intentional Infliction of Emotional Distress Claim Must Survive Summary Judgment.

An intentional infliction of emotional distress ("IIED") claim requires: 1) the defendant either intended to cause emotional distress or knew or should have known that actions would result in serious emotional distress; 2) defendant's conduct was so extreme and outrageous as to go beyond the bounds of decency and can be considered utterly intolerable in a civilized community; 3) defendant's actions were the proximate cause of plaintiff's psychic injury; and 4) mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it. *Rubin v. Ford Motor Co.,* 2006 U.S. Dist. LEXIS 51522, 2006 WL 2128934, *14-15 (S.D. Ohio July 27, 2006), citing *Pyle v. Pyle,* 11 Ohio App.3d 31, 34 (1983). Here, Flagg and Williams caused Wright serious injuries and fabricated evidence to cover up their misconduct. Defendants cannot argue they did not know or should not have known that such conduct would result in serious emotional distress. This conduct was extreme and outrageous, and goes beyond the bounds of decency. Wright suffered and continues to suffer severe and unendurable psychic injury, including

continued dreams and constant fear of police. Summary judgment must be denied on this claim.

### 3. Flagg and Williams Are Not Entitled to Ohio Rev. Code § 2744 Immunity.

As plead in Plaintiff's Sixth Claim for Relief, political subdivision employees who engage in "acts or omissions with malicious purpose, in bad faith, or in a wanton or reckless manner" are not immune from suit in Ohio. Ohio Rev. Code § 2744.03(6); *Anderson v. Massillon*, 134 Ohio St.3d. 380, 983 N.E. 2nd 266 (2012) at ¶23. The same acts depriving Flagg and Williams of qualified immunity deprive them of §2744 immunity: these acts could be interpreted by a reasonable jury as willful, wanton, or reckless conduct. *See*, e.g., *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013); *Reynolds v. Oakwood*, 38 Ohio App.3d 125, 127 (Ohio Ct. App. 1987), citing *Botto v. Fischesser*, 174 Ohio St. 322, 325-26, (1963). Defendants are not entitled to immunity.

### III.    THE CITY OF EUCLID WAS THE MOVING FORCE BEHIND CONSTITUTIONAL VIOLATIONS SUFFERED BY LAMAR WRIGHT.

Plaintiff's Fifth Claim for Relief concerns the City of Euclid's liability for these constitutional violations. To achieve municipal liability under 42 U.S.C. § 1983 and *Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978), Plaintiff must show that EPD's policy, custom, or procedure was the moving force behind the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378 (1989). A municipality can be liable for violations caused by enforcement of a municipal policy, *Monell*, 436 U.S. at 694, or by failure to train or supervise. Plaintiff can prevail on his *Monell* claim independent of whether Defendants are granted qualified immunity. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993).[21]

An unconstitutional policy can include implicit policy or gaps in policies. *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016); *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir.

---

[21] *See*, e.g., *Doe v. Sullivan County, Tenn*., 956 F.2d 545, 554 (6th Cir. 1992); *Gray v. City of Detroit*, 399 F.3d 612, 616-17 (6th Cir. 2005); *Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir. 1992); *Scott v. Clay County, Tenn*., 205 F.3d 867, 879 (6th Cir. 2000).

1986). "[C]ustoms, in contrast to official policies, do not receive 'formal approval,'" and instead are "'persistent and widespread . . . practices of . . . officials.'" *Monell*, 436 U.S. at 690-691; *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010). "[P]olicy or custom does not have to be written law; it can be created 'by those whose edicts or acts may fairly be said to represent official policy.'" *Id*. The record shows that the EPD has a custom of racist, excessive force.

Further, Plaintiff can establish a policy or custom claim by a final decision-maker ratifying illegal actions. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013), citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *Sweat v. Butler*, 90 F. Supp. 3d 773, 785 (W.D. Tenn. 2015). Ratification requires that "(1) a final municipal policymaker approved an investigation . . . (2) . . . so inadequate as to constitute a ratification of the[] alleged constitutional violation." *Rush v. City of Mansfield*, 771 F. Supp. 2d 827, 861-62 (N.D. Ohio 2011) (alterations in original) (internal citations omitted). "A single decision can constitute a policy, if that decision is made by an official who 'possesses final authority to establish municipal policy with respect to the action ordered.'" *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986) ("More importantly, where action is directed by those who establish government policy, *the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.*"); *see also Miller v. Calhoun Cnty.*, 408 F.3d 803, 816-17 (6th Cir. 2005). Meyer's utter lack of investigation and discipline here constitute ratification.

Failure-to-train or supervise liability exists where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. Single-incident liability for failure-to-train claims is available where the need for more or different training is so obvious that a plaintiff's injury is a

"highly predictable consequence" of deficient training where situations are likely to reoccur. *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011); *Canton*, 489 U.S. at 390; *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 396, 409 (1997); *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015); *Sherrod v. Williams*, 2019 U.S. Dist. LEXIS 8915 at *6. "Liability under this theory depends on the 'likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Brown*, 520 U.S. at 409-10. <u>Given EPD's blatant policy gaps and failures to supervise and train on certain topics – *inter alia*, OC spray, Taser, and use of force generally – are so obvious that Wright's injuries were a "highly predictable consequence</u>," and a reasonable jury could find that (1) EPD's training was inadequate for the tasks officers must perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused Wright's injury. *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006). (*See* Taylor Report, Pl. Ex. 6.) In fact, the EPD has already been harshly criticized by this Court for its failure to appropriately train officers concerning use of force. *See Stewart v. City of Euclid, et al.*, Case No. 1:17-CV-02122, July 13, 2018 Opinion and Order, attached as Pl. Ex. 11, at pp. 27-29. Though this one incident is enough for liability, the EPD has an undeniable track record of excessive force.

Finally, moving force causation is a question of fact for the jury. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988); *Oklahoma v. Tuttle*, 471 U.S. 808, 833 n.9 (1985) (Brennan, J., concurring); *Powers v. Hamilton Cnty. Public Defender*, 501 F.3d 592, 608 (6th Cir. 2007). Plaintiff's *Monell* claim must proceed to trial.

## CONCLUSION

For the reasons stated above, Plaintiff asks the Court to deny Defendants' motion for summary judgment in its entirety and to permit this case to proceed to trial.

Respectfully submitted,

*/s/ Jacqueline C. Greene*
JACQUELINE C. GREENE (0092733)
SARAH GELSOMINO (0084340)
TERRY H. GILBERT (0021948)
FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
T: (216) 241-1430
F: (216) 621-0427
jgreene@f-glaw.com
sgelsomino@f-glaw.com
tgilbert@f-glaw.com

*Counsel for Plaintiff Lamar Wright*

# CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2019, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing

system. Parties may access this filing through the Court's system.

*/s/ Jacqueline C. Greene*
JACQUELINE C. GREENE
*One of the Attorneys for Plaintiff*

31